UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORY SLONE,

        Plaintiff,

v.

UNKNOWN FAIR, UNKNOWN CANTU,
and, UNKNOWN FREEMAN,

        Defendants.

Case No. 1:20-cv-144

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by *pro se* plaintiff Cory Slone (referred to as plaintiff or "Slone"). Slone, a prisoner in the custody of the Michigan Department of Corrections (MDOC), is suing three defendants, Corrections Officers (COs) Fair, Cantu, and Freeman, for an incident which occurred at the Carson City Correctional Facility (DRF). This matter is now before the Court on defendants' motion for summary judgment (ECF No. 22).

    **I.**    **Complaint**

Slone set out the following allegations in his verified complaint (ECF No. 1).[1]

**Facts related to CO Fair and CO Cantu**

---

[1] *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment).

On September 20, 2019, while entering the DRF Food Service Building ("chow hall"), Slone presented his identification ("ID") card to defendant CO Fair to be scanned. Compl. at PageID.5. Fair did not scan the card and motioned for Slone to come back. *Id*. Slone presented his card, at which time Fair "immediately grabbed and yanked me and aggressively smashed my face into the plexiglass, handcuffed me as tightly as possible, and pushed and shoved me into doors and wells all the way to segregation." *Id*. Fair's actions broke Slone's glasses, caused a laceration above his eye, injured his head and shoulder, and caused pain and numbness in his fingers and thumb. *Id*. In Slone's words, this incident "caused me to be too afraid to enter the chow hall when CO Fair is present (during breakfast and lunch) and seek mental health treatment." *Id*. Once in segregation, Fair threw plaintiff "headfirst into a holding cell" and said, "That's for Cantu, asshole! Now grieve that!" *Id*. On the same day, a prisoner informed Slone that he heard Fair laughing and telling another corrections officer, "I fucked that fucker up!". *Id*. at PageID.6.

Slone alleged that Fair's assault arose from an incident involving CO Cantu,

> 6. Two or three days prior, in the chow hall, I had presented my ID to CO Cantu to be scanned, but he told me "stop being lazy" and to hold it up, so I complied, but informed him I would be grieving him for degrading me.
>
> 7. CO Cantu ordered me to give him my ID and I complied, but asked him why and he said so he could ticket me.

*Id*. at PageID.5. Later, a prisoner told Slone that he heard Cantu tell Fair that Slone was grieving him and that Cantu was going to find a way to retaliate against him. *Id*. Fair reportedly responded, "I'll get his ass." *Id*.

Fair also "fabricated a 'Major' ticket" against Slone for threatening behavior, which "falsely stated" that Slone shoved his hand and ID towards Fair's face intending to threaten or

2

possibly harm him. On October 2, 2019, a hearing officer found that based on a film of the incident, Slone's actions fell "Far short of [Fair]'s allegations" and that the evidence was insufficient to establish that Slone's actions expressed an intent to injure or physically abuse Fair. *Id*. at PageID.5-6.

### Facts related to CO Freeman

Slone also alleged that on September 24, 2019 (while he was in segregation before the misconduct hearing), defendant CO Freemen disposed of numerous items that Slone was allowed to possess and ordered him to choose between disposing of, mailing home, or having someone pick up the items. *Id*. at PageID.6. Slone told Freeman that "his actions violated my due process rights and were contrary to MDOC policies and procedures, and I was grieving." *Id*. "CO Freemen informed me that I was going to be found guilty, so he was not waiting until after my hearing, he could do what he wanted, grievances do not matter and, '[he] heard [I] was an asshole!'". *Id*. After Slone was found not guilty of the misconduct ticket, "CO Freeman botched the efforts of a unit CO and counselor to return my footlocker, sweatpants, magazines and books, which they attributed to CO Freemen's reaction to me 'beating,' i.e., being found not guilty of, CO Fair's fabricated ticket (Exs. B & C) and my grievances." *Id*.

Finally, Slone alleged that CO Cantu later "apologized for his role in initiating actions that caused my injuries." *Id*.

### Slone's claims

Slone's complaint alleged three "claims". First, "CO Fair's actions violated my right not to be conspired and retaliated against for my protected activities and assaulted under federal and state tort law and the First and Eighth Amendments of the U.S. Constitution." *Id*.

Second, "CO Cantu's actions violated my right not to be conspired and retaliated against for my protected activities under federal and state tort law and the First Amendment of the U.S. Constitution." *Id*. at PageID.7. Third, "CO Freeman's actions violated my right not to be conspired and retaliated against for my protected activities under federal and state tort law and the First Amendment of the U.S. Constitution." *Id*. Slone seeks compensatory and punitive damages against all defendants. *Id*.

## II. Motion for summary judgment

### A. Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

4

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Constitutional claims

Slone seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

#### 1. First Amendment Retaliation claims

To prove a First Amendment retaliation claim, a plaintiff must establish three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

##### a. CO Cantu

Here, the alleged protected conduct was Slone's threat to file a grievance against CO Cantu because Cantu: told Slone to stop being lazy; told Slone hold up his ID card; and called

Slone an asshole.[2]   Where a prisoner threatens to file a grievance which is "arguably legitimate," his conduct is "arguably protected" by the First Amendment. *See Pasley v. Conerly*, 345 Fed. Appx. 981, 985 (6th Cir. 2009).   Here, there is no protected conduct because Slone's threat to file a grievance against CO Cantu was not "arguably legitimate."

Slone threatened to file a grievance against CO Cantu for calling him lazy, telling him to hold up his ID card, and calling him an asshole.   "Verbal harassment or idle threats by a state actor do not create a constitutional violation and are insufficient to support a section 1983 claim for relief."   *Wingo v. Tennessee Department of Corrections*, 499 Fed. Appx. 453, 455 (6th Cir. 2012).   As the Sixth Circuit previously stated,

> An inmate has no constitutionally protected right to be free from verbal abuse . . . . Thus in the case at bar, [the plaintiff's] claim that he was retaliated against for threatening to file a frivolous grievance will not support a retaliation claim under *Thaddeus-X*.

*Scott v. Kilchermann*, 230 F.3d 1359, 2000 WL 1434456 at *2 (6th Cir. Sept. 18, 2000). *See, generally, Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) ("Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."). While Cantu's alleged actions may have been unprofessional, his comments directed to Slone did not rise to a level of a federal constitutional

---

[2] While Slone filed a grievance, he did not do this until October 3, 2019, the day after the hearing officer found him not guilty of the misconduct and more than two weeks after the alleged incident.  In Grievance DRF-19-10-2325-17A ("2325") Slone stated (in his words):

> On 9/17 or 9/18 as I was coming through the cafeteria line I presented my ID to C/O Cantu, ID laying face up on my palm.  Canto told me to "stop being lazy" and hold my ID up.  I told Cantu I will file a grievance if he degrade me again.   Cantu then stated, "Give me your ID asshole."   I gave him my ID and told him I would be filing a grievance.

Grievance 2325 (ECF No. 1-1, PageID.28).

violation. Accordingly, the motion for summary judgment should be granted as to Slone's claims that Cantu retaliated against him.

        **b.**      **CO Fair**

With respect to CO Fair, Slone's alleged retaliation claim involved the following elements: the protected conduct was Slone's threat to file a grievance against Cantu; the adverse action was Fair's assault of Slone and writing Slone a false misconduct ticket; and the causal connection was Fair's statement to Cantu that "Oh [Slone] wants to file a grievance [?] I'll get his ass." Compl at PageID.5. As discussed, Slone's threat to file a grievance was not protected conduct. Accordingly, the motion for summary judgment should be granted as to Slone's claim that CO Fair retaliated against him.

        **c.**      **CO Freeman**

Slone has not alleged the elements of a retaliation claim against CO Freeman. The gist of Slone's claim is that Freeman prematurely packed up Slone's property because Freeman assumed that Slone would be convicted of the major misconduct ticket. As discussed, Slone's threat to file a grievance against CO Cantu was not protected conduct. While Slone also threatened to file a grievance against Freeman, this could not have caused the alleged retaliatory conduct because he made this threat while Freeman was sorting Slone's property. *See* Compl. at PageID.6.

Furthermore, there was no adverse action. Defendants point out that the amount of property which Slone could possess was reduced pursuant to MDOC policy. On September 23, 2019, while Slone had a "true security level" of Level II, his "actual placement level" was Level IV. *See* Security Classification Screen – Review (ECF No. 1-1, PageID.19). Since Slone

7

was actually placed at Level IV, his allowable property was reduced to that property which a prisoner at Level IV could possess:

> If a prisoner is placed in Level IV or V except as an initial placement from a reception facility and the prisoner's true security level is less than the security level at which the prisoner is placed (i.e., waived to increased custody), the prisoner's property that is not allowed at that level shall be stored for the prisoner at the receiving facility for at least 30 calendar days or until the prisoner has exhausted available administrative remedies (e.g., grievance process), whichever is longer, so that the prisoner is not deprived of the property if returned to a security level in which the property is allowed. This does not restrict the prisoner from electing to dispose of the property as otherwise allowed by this policy in lieu of storage.

MDOC Policy Directive 04.07.112 ¶ BB (ECF No. 23-4, PageID.174-175). In his affidavit, Freeman stated that when prisoners are reclassified to a higher placement level, the amount and type of property they are permitted to possess is reduced, and that it is his job to identify items that are not permitted. *See* Freeman Aff. (ECF No. 23-6, PageID.194).

Here, Slone signed a property release form, dated September 24, 2019, which reflects that he released property to "Lucy Brown" (including foot locker, sweat bottoms, 1 pair green socks, 1 pair blue shorts, 2 dress shirts, a piece finished hobby craft, 3 magazines and 2 books) and that the property was picked up by Lucy Brown Russell on February 23, 2020. *See* Property Release Form (Sept. 24, 2019) (ECF No. 23-8, PageID.207). Based on this record, the property was released as Slone directed in accordance with MDOC policy. Accordingly, the motion for summary judgment should be granted as to Slone's claim that CO Freeman retaliated against him.

**2. Conspiracy**

In a related claim, Slone alleged that defendants conspired to retaliate against him. "A civil conspiracy is an agreement between two or more persons to injure another by unlawful

action." *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id*. at 944. Here, Slone must show that: (1) "a single plan" existed; (2) "the alleged coconspirator shared in the general conspiratorial objective" to deprive Slone of a constitutional right (or a federal statutory right); and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to Slone. *Id*.

It appears that Slone alleged the existence of a conspiracy to demonstrate a causal connection between his threat to file a grievance against Cantu and the alleged adverse action taken by Fair. Viewing the evidence in the light most favorable to Slone, there is no evidence that Cantu and Fair had a "single plan" to retaliate against Slone. While Cantu contemplated retaliation, Fair made a decision to take action against Slone. In this regard, there was no basis for the alleged "conspiratorial objective" to deprive Slone of a federal constitutional right, *i.e.*, Slone's threat to file a grievance was not protected conduct and there was no First Amendment violation. Finally, there is no evidence that Freedman was a party to a conspiracy against Slone. Accordingly, the motion for summary judgment should be granted as to Slone's conspiracy claims against all defendants.

### 3.    **Eight Amendment excessive force claim**

Slone alleged that CO Fair engaged in excessive force contrary to the Eight Amendment. The Supreme Court has held that "the unnecessary and wanton infliction of pain . . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). "The contemporary standards of civilized decency that currently

prevail in society determine whether conditions of confinement are cruel and unusual." *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004), citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson*, 503 U.S. at 8.

The objective component requires the infliction of serious pain. *Id.* at 8-9. In excessive force cases, the core judicial inquiry is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (internal quotation marks omitted).

> When prison officials maliciously and sadistically use force to cause harm . . . contemporary standards of decency always are violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Id.* (internal quotation marks omitted) (citing *Hudson*, 503 U.S. at 9).

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "It is obduracy and wantonness, not

inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Slone's verified complaint alleged that with no provocation, Fair smashed his face into the plexiglass, "handcuffed [him] as tightly as possible," and "pushed and shoved [him] into doors and wells all the way to segregation." Compl. at PageID.5. At his deposition, Slone testified as follows.

> I came again through the chow line and C/O Fair was at the podium scanning IDs. I presented my ID to him the same way I've done it for the last eight plus years and he made a big issue about the way I had it in my hand in retaliation for his colleague, Cantu. . . .
>
> I pulled my ID out, I opened my hand so my ID would fall flat, I looked at the ID so I knew the bar code was face up. I extended my hand so he could scan it, he backed away and said no. I put the ID back in my pocket and proceeded to go and get a tray. . . .

Slone Dep. (ECF No. 23-2, PageID.139, 141).

In response to an interrogatory, CO Fair described the incident as follows:

> Answering over objection and without waiving, in Food Service there is a line where prisoners are asked to present their prisoner identification cards. Their ID cards are scanned, then they are permitted to pass the scanning podium where the officer is located to get their food. Prisoners routinely put their ID card very close to the scanner so it can be successfully scanned.
>
> Prisoner Slone was in chow line and was asked to present his prisoner identification card. Prisoner Slone presented his card in a way that was different than the prior prisoners and not as close. The ID card was not scanned, but before the scanning issue could be resolved Plaintiff walked past me, put his ID in his pocket, and went to get food. I asked him to come back and present his identification card so it could be scanned. He pulled his ID from his pocket and presented it, but it was not close to the scanner nor was it presented as I said it should be presented. He was asked to present it facing the officer, then he quickly and aggressively thrusted his ID card very close to my face now perpendicular to the ground between his thumb and four fingers. The speed and closeness to my face was perceived as an impermissible act of aggression toward the officer. Prisoner

11

> Slone's act of aggression toward the officer made him a security threat, and he was secured to ensure the safety and security of people in food service at that time.

Fair Interrog. (ECF No. 23-7, PageID.199-200).

Finally, in finding Slone not guilty of the major misconduct (threatening behavior), the hearing office found that the film of the incident "depicts that there was obviously an issue with scanning the charged prisoners [sic] ID card and it indicates that the charged prisoner was not at all reluctant from the onset to produce that ID card" and that "as such, this ALJ finds that the evidence is insufficient to establish that the charged prisoner's actions expressed an intent to injure or physically abuse the reporting staff." Hearing Report (ECF No. 1-1, PageID.17) (emphasis added).

Viewing the evidence in the light most favorable to Slone, genuine issues of material fact exist as to whether CO Fair used excessive force under the circumstances. Accordingly, the motion for summary judgment should be denied as to Slone's excessive force claim against defendant Fair.

### III.  Qualified immunity

Defendants' brief includes a recitation of the legal standard for qualified immunity (PageID.123-125) followed by a one-sentence conclusory argument, *i.e.*, "For the reasons stated above, Fair, Cantu, and Freeman are entitled to qualified immunity because Slone has not demonstrated that they violated any clearly established constitutional or statutory right." PageID.125. Defendants have not addressed their claim of qualified immunity in a meaningful manner. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson*

*v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).   Accordingly, defendants' motion for summary judgment should be denied to the extent they seek qualified immunity for their actions.

### IV.   State law claims

Slone's complaint refers to violations of his rights under "state tort law."   Pursuant to 28 U.S.C. § 1367(a), this Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if --
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

If the undersigned's recommendation is adopted, the only issue for trial is whether CO Fair used excessive force against Slone. In determining whether to retain supplemental jurisdiction over Slone's "state tort law" claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion General Hospital, Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).   Ordinarily, where a district court has exercised jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to

trial, the court will dismiss the remaining state law claims. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims."). "Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (internal quotations omitted). Dismissal, however, remains "purely discretionary." *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c).

Here, the Court should decline to exercise supplemental jurisdiction over Slone's "state tort law" claims related to alleged retaliation and conspiracy. Assuming that the Court dismisses the federal claims of retaliation and conspiracy, these state law claims are not related to the federal claim which remains in this lawsuit. There is no reason for the Court to complicate the issues at trial by needlessly deciding possible "state tort law" claims of conspiracy and retaliation against three defendants, two of whom have no federal claims remaining against them. *See Experimental Holdings, Inc.*, 503 F.3d at 521; *Landefeld*, 994 F.2d at 1182. *See also, Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996) (as a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims.").

The Court should also decline supplemental jurisdiction over Slone's claim that CO Fair committed an assault under "state tort law". As the court found in *Smelley v. City of Detroit*, No. 07-CV-14824, 2007 WL 4326905 at *7 (E.D. Mich. Dec. 7, 2007), including a state law claim for assault in a trial involving a federal claim of excessive force "could lead to jury confusion,

14

judicial inefficiency, inconvenience to the parties and an unfair outcome."  Among other things, the court in *Smelley* pointed out: that the federal standard for evaluating excessive force is an objective one, while a state law claim for assault and battery focuses almost entirely on the officer's subjective mental state; that the state law claims would require a jury to understand, distinguish and apply two distinct standards of reasonableness in the same case which "would certainly result in more lengthy jury instructions, potential jury confusion and inconvenience to the parties that would not be present if the claims were tried separately;" and that the "state and federal law claims also apply different versions of immunity, a further complication in their being tried together." *Smelley*, 2007 WL 4326905 at *3-5.  The court also noted that "[t]he potential for jury confusion has been identified as a compelling reason for a district court to decline to exercise supplemental jurisdiction."  *Id*. at *6.  For all of these reasons, this Court should also decline to exercise supplemental jurisdiction over the "state tort law" claim for assault pursuant to § 1367(c)(4).

## V. Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (ECF No. 32) be **GRANTED** as to plaintiff's retaliation and conspiracy claims alleged against defendants Cantu, Fair and Freeman, and **DENIED** as to plaintiff's excessive force claim alleged against defendant Fair.

I further recommend that the Court decline to exercise supplemental jurisdiction over plaintiff's "state tort law" claims pursuant to 28 U.S.C. § 1367(c) and that these claims be **DISMISSED**.

I further recommend that this case proceed to trial against defendant Fair on plaintiff's excessive force claim brought pursuant to 42 U.S.C. § 1983.

Dated:  June 13, 2022                                  /s/ Ray Kent
                                                       RAY KENT
                                                       United States Magistrate Judge


**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.   All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).